**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SCHINDLER ELEVATOR CORPORATION,

               Plaintiff,

      v.

CR SUNFLOWER LESSEE, LLC, 7 HANOVER
FEE OWNER CO., LLC, and GFP REAL
ESTATE LLC,

               Defendants.

Civil Action No. _____

**COMPLAINT AND JURY DEMAND**

Plaintiff, Schindler Elevator Corporation ("Schindler" or "Plaintiff")), by its undersigned attorneys, alleges against Defendants CR Sunflower Lessee, LLC ("CR Sunflower"), 7 Hanover Fee Owner Co., LLC ("7 Hanover Fee Owner," and together with CR Sunflower, the "7 Hanover Owner"), and GFP Real Estate LLC ("GFPRE," and together with the 7 Hanover Owner, "Defendants") as follows:

### PRELIMINARY STATEMENT

1.     Schindler brings this action in order to secure the return of proprietary property, including proprietary technology and valuable trade secrets, that is currently being wrongfully withheld by Defendants. Despite Schindler's diligent efforts to recover these materials, Defendants have refused to return them and have prevented Schindler from recovering its property from the site where it previously performed elevator modernization and maintenance services, 7 Hanover Square in Manhattan, New York City.  To make matters worse, Defendants have permitted a competitor of Schindler, which replaced Schindler as the elevator maintenance contractor for 7

Hanover Square, to access the 7 Hanover Square premises and elevator controllers therein, imperiling the confidentiality of Schindler's trade secrets and proprietary technology. Defendants' wrongful retention and mishandling of that property threatens to cause Schindler severe and irreparable injury.

2.      Schindler is one of the leading global manufacturers of elevators, escalators, and moving walks. Schindler manufactures, installs, services, maintains, and modernizes these devices throughout in buildings of various types all over the world. The company specializes in latest-technology engineering, as well as mechanical and micro-technology products designed and rigorously tested for comfort, efficiency and reliability.

3.      Until recently, Schindler had been the elevator contractor for several years of the building known as 7 Hanover Square ("7 Hanover Square"), a commercial office tower in lower Manhattan, New York City which is owned by 7 Hanover Owner. In February 2026, GFPRE, the property manager of 7 Hanover Square, informed Schindler that 7 Hanover Owner was cancelling the elevator maintenance contract between Schindler and 7 Hanover Owner.

4.      After receiving notice of the contract's termination, and for multiple months thereafter, Schindler has repeatedly requested the return of its personal property and trade secrets that it had maintained at the 7 Hanover Square premises, and has explained to Defendants its entitlement to recover that property. To date, Defendants have spurned Schindler's requests, asserting shifting and contradictory rationales for their refusal to return Schindler's property.

5.      To Schindler's dismay, Defendants also have inadequately safeguarded Schindler's confidential information and trade secrets and, upon information and belief, have permitted a competitor of Schindler's to access the areas where Schindler's property is being held. Schindler is

2

0000HSO.0823480  4925-2160-9642v6

justifiably concerned that access to that property will allow Schindler's competitors to unfairly gain a competitive advantage.

6.      Accordingly, Schindler brings this action to seek damages, preliminary and permanent injunctive relief, and other equitable remedies for Defendants' breach of contract; improper acquisition, use, and disclosure of Schindler's confidential and trade secret information; and conversion of Schindler's personal property.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. § 1836 and 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over the other claims asserted herein pursuant to 28 U.S.C. § 1367.

8.      This Court has personal jurisdiction over Defendants pursuant to CPLR 301 and 302 and consistent with constitutional due process, because Defendants either have a principal place of business in New York and/or because the property that is the subject of this action is located in New York and the parties have transacted business that gave rise to this action in New York.

9.      Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial portion of the events or omissions giving rise to the claims herein occurred in this District and a substantial part of the property that is subject to this action is situated in this District.

## PARTIES

10.     Plaintiff Schindler is and at all times was a Delaware corporation duly organized and existing under the laws of Delaware and a contractor duly licensed to do business in the State

3

of New York.  Schindler's principal place of business is located at 20 Whippany Road, Morristown, New Jersey 07960.

11.    Upon information and belief, Defendant 7 Hanover Fee Owner is and at all times was a limited liability company duly organized and existing under the laws of Delaware, with its principal place of business located at 7 Hanover Square, New York, New York 10004.  Upon information and belief, 7 Hanover Fee Owner is and/or at relevant times, was, owner of the real property and improvements located in New York County at 7 Hanover Square, New York, New York 10004 (previously defined as "7 Hanover Square").

12.    Upon information and belief, Defendant CR Sunflower is and at all times was a limited liability company duly organized and existing under the laws of Delaware, with its principal place of business located at 7 Hanover Square, New York, New York 10004.  Schindler is informed and believes, and on that basis alleges, that CR Sunflower is current owner of 7 Hanover Square.   Upon information and belief, insofar as CR Sunflower is a current owner of 7 Hanover Square, CR Sunflower is a successor-in-interest to 7 Hanover Fee Owner, and/or jointly and severally responsible for the obligations and liabilities of 7 Hanover Fee Owner to Schindler.

13.    Upon information and belief, Defendant GFPRE is and at all times was a limited liability company duly organized and existing under the laws of New York, with its principal place of business located at 515 Madison Avenue, New York, New York 10022.  Upon information and belief, GFPRE is, and at all relevant times, was the property manager of 7 Hanover Square and agent of 7 Hanover Owner.

4

**FACTS COMMON TO ALL CLAIMS**

**A.      Schindler's Cutting Edge and Proprietary Technology**

14.      Schindler designs its own elevator systems.  One of the cutting edge features of those systems is Schindler's proprietary PORT technology—a patented software system that allows passengers to select the destination floor before entering an elevator, so that passengers going to the same floor will be directed to take the same elevator.  In this way, the PORT system reduces the number of intermediate stops for each round trip, thereby enabling the elevator to return to the main lobby sooner.

15.      Over the last thirty years, Schindler has invested heavily in its PORT technology, resulting in many patented evolutions in elevator design and technology:



16.      Schindler also trains mechanics on how to service elevator systems equipped with the PORT technology.  Schindler mechanics are required to undergo an intensive, proprietary course that teaches proper maintenance and service of the PORT system.

0000HSO.0823480  4925-2160-9642v6

17.    As part of its comprehensive training program, Schindler has also developed proprietary manuals (which are provided to Schindler's certified maintenance personnel) on how to best maintain, service, and adjust the Schindler's PORT system and equipment.    The information contained in these materials required years of testing and research.

18.    As part of its proprietary suite of technology, Schindler also creates proprietary SIM cards that are used purely for diagnostic purposes.    These SIM cards are used by Schindler's technicians, as needed, to adjust and commission the elevator systems.

19.    To be clear, the SIM cards are not necessary to perform diagnostic or maintenance services; rather, the SIM cards allow access to set original equipment manufacturer ("OEM") factory parameters.    The elevators still retain their function even after Schindler's SIM cards are removed.    Any competent elevator contractor can log into the Service Module Liquid Crystal Display ("SMLCD") screen on the elevator to perform all testing and maintenance on the elevator systems, regardless of whether the SIM card is inserted into the elevator controller or not.    The SMLCD provides clear and explicit instructions on how to maintain the elevator systems even if Schindler is not the elevator contractor.

20.    As the SIM cards are Schindler's proprietary technology (and are marked as such, bearing the message "This Card is the Property of Schindler Elevator Corp. and Must Be Returned Upon Request" in bold writing), the cards do not remain with the elevator equipment if the owner chooses to hire another contractor to service their Schindler equipment.

21.    As a result of its innovations in elevator technology, Schindler is consistently recognized as one of the world's "big four" elevator companies.    And because Schindler's success in the competitive marketplace is dependent on the uniqueness of its services and products, the company devotes significant money and research to developing its PORT technology and its proprietary maintenance processes in support thereof.

6

0000HSO.0823480  4925-2160-9642v6

22.     Naturally, Schindler's ability to achieve success in this competitive market hinges on its ability to protect its proprietary information from public disclosure, including from its competitors.

23.     Schindler therefore takes diligent and reasonable measures to protect its proprietary information, including that contained in its SIM cards, electronic files, manuals and other equipment relating to its PORT technology.  These measures include (1) disclosing its proprietary maintenance and adjustment procedures only to its factory trained maintenance technicians, who in turn are required to keep the information confidential; (2) marking and designating the Schindler manuals that contain Schindler's proprietary maintenance and adjustment procedures as confidential and assigning each manual to an individual Schindler employee, who in turn is certified to maintain and service the appropriate Schindler equipment and has agreed to keep the manual confidential.

**B.     Schindler's Modernization and Maintenance Contract for 7 Hanover Square**

24.     Upon information and belief, in 2019, 7 Hanover Owner began implementing an improvement plan to modernize and maintain 19 elevators in 7 Hanover Square, and sent Schindler an invitation to bid for the modernization and maintenance project.

25.     On or about January 7, 2020, GPRE informed Schindler that it had been selected for the 7 Hanover Square modernization and maintenance project.  On January 10, 2020, 7 Hanover Fee Owner and Schindler entered into a contract for the modernization, refurbishment and maintenance of the elevators and elevator systems at 7 Hanover Square (the "EMM Contract") using Schindler's proprietary PORT Technology.  Under the EMM Contract, Schindler installed and commissioned its proprietary TX-R5 elevator control systems for the elevators.  Schindler's proprietary SIM cards are located in the elevator's controller within each elevator.  As stated

7

0000HSO.0823480   4925-2160-9642v6

above, the SIM cards are not necessary to perform diagnostic or maintenance services on the elevators, and the elevators still retain their function even after Schindler's SIM cards are removed. Any competent elevator contractor can log into the SMLCD screen on the elevators to perform all testing and maintenance on the elevator systems, regardless of whether the SIM card is in the elevator controller or not. The SMLCD provides clear and explicit instructions on how to maintain the elevator systems even if Schindler is not the elevator contractor.

26. As part of its elevator maintenance operations at 7 Hanover Square, Schindler employees have occupied and operated in the elevator machine room (the "Specified Area") at 7 Hanover Square.

27. Stored within this Specified Area are electronic files stored within the Schindler PORT lobby vision programming station, manuals containing proprietary maintenance procedures, and other materials containing Schindler trade secrets that Schindler mechanics use to maintain the elevators at 7 Hanover Square (collectively with the SIM cards which are located in each elevator's controller, "Proprietary Materials"). The manuals include Schindler's TXR5 Elevator Installation and Adjustment Manual, TXR5 troubleshooting manual, PORT manuals, TXR5 Parts manuals, Schindler parts manuals, service delivery manuals, and manuals for the PORT lobby vision programming stations.

28. The Proprietary Materials are indisputably Schindler's property. Each manual, for instance, is marked with Schindler's watermarks or assigned to a specific Schindler mechanic who is certified and trained to maintain and service Schindler equipment and Schindler's PORT technology. Similarly, each SIM card bears the message "This Card is the Property of Schindler Elevator Corp. and Must Be Returned Upon Request" in bold writing.

0000HSO.0823480   4925-2160-9642v6

29.     The Proprietary Materials, including the manuals, files and SIM cards, contain trade secrets: Schindler's proprietary processes, methods, and practices to maintain its PORT technology and its equipment.  Schindler derives independent economic value from its trade secrets not being generally known to or readily ascertainable by others, especially competitors.  As discussed above, Schindler employs internal policies to ensure that its proprietary processes are maintained in secrecy and not readily accessible by the public.

30.     The Proprietary Materials are not deliverables under the EMM Contract and Defendants are not entitled to retain them after termination of the EMM Contract.  For instance, the Invitation to Bid, which is incorporated into the EMM Contract by reference, includes a notation expressly stating that "No diagnostic tools are required.  LCD in controller."  In other words, the SIM cards and other Proprietary Materials are not needed to perform diagnostic or maintenance services on the elevator systems; such tasks can be performed using the SMCLD screen which remain in the elevators and which other elevator contractors would be able to access even after the SIM cards and other Proprietary Materials are removed.

31.     Schindler performed its elevator modernization tasks pursuant to the EMM Contract and, for multiple years thereafter, continued to perform its elevator maintenance obligations in accordance with the terms of the EMM Contract and a follow-on Vertical Transportation Maintenance Specification Contract that the parties entered into, dated March 15, 2022 ("2022 Maintenance Contract"), which replaced the EMM Contract.

0000HSO.0823480  4925-2160-9642v6

**C.      Defendants Terminate Schindler's Maintenance Contract and Refuse to Return Schindler's Property**

32.      On February 1, 2026, Schindler received a letter from GFPRE notifying Schindler that CR Sunflower Lessee, the reputed owner of 7 Hanover Square, was terminating the 2022 Maintenance Contract, such that Schindler would no longer be providing maintenance support for the elevators at 7 Hanover Square.  Upon information and belief, before terminating the 2022 Maintenance Contract, 7 Hanover Owner awarded a maintenance contract for the 7 Hanover Square elevators to a competitor of Schindler's.

33.      After receiving notice of termination, Schindler had discussions with representatives of Defendants to arrange to remove Schindler's Proprietary Materials that were (or were supposed to be) onsite at 7 Hanover Square.  Schindler's personnel then visited the site to collect Schindler's Proprietary Materials, but were forbidden by Defendants' representatives from opening the elevator controllers to remove Schindler's SIM cards or collect its other property.

34.      Subsequently, a General Manager at Schindler visited 7 Hanover Square to photograph and document the site to confirm the manner in which the elevator machinery spaces were left and identify Schindler's Proprietary Materials for retrieval.  However, he too was denied access to open the elevator controllers and document their status, and, except for a limited number of manuals and user guides, he was forbidden from confining the files in the lobby vision programming station to remove Schindler's property.

35.      On February 19, 2026, Schindler's in-house counsel wrote to GFPRE and to CR Sunflower's reputed elevator consultant, Vertical Transportation Consulting, Inc., demanding, among other things, the return of Schindler's SIM cards.

0000HSO.0823480  4925-2160-9642v6

36.     Defendants, through GFPRE and CR Sunflower's reputed consultants, refused Schindler's initial demand, as well as multiple follow-up demands over the course of the ensuing weeks, for the return of Schindler's SIM cards and its manuals and files in the lobby vision programming station.

37.     Schindler reasonably fears that Defendants have disclosed Schindler's trade secrets to a competitor that took over as the elevator maintenance provider for 7 Hanover Square, even as Defendants continue to reap the benefits of Schindler's proprietary maintenance processes. Schindler is also justifiably and gravely concerned that one of its competitors has wrongfully accessed Schindler's Proprietary Materials in order to gain an unfair competitive advantage.

38.     On May 1, 2026, Schindler, through its counsel, sent a final letter in good faith demanding that Defendants allow Schindler to retrieve its property. Schindler told Defendants that failure to comply with Schindler's demands would leave Schindler with no choice but to seek judicial relief.

39.     On May 7, 2026, Defendants, through counsel, again refused Schindler's demands.

40.     To date, Defendants have not provided any assurances that they will return Schindler's personal property and trade secrets. Accordingly, Schindler brings this lawsuit to seek immediate recovery of its property wrongfully possessed by Defendants. Schindler also seeks damages for the harm it has suffered as a result of the trade-secret violations, breach of contract, and other unlawful conduct alleged herein.

## FIRST CAUSE OF ACTION
### Violation of the Federal Defend Trade Secrets Act (18 U.S.C. § 1836 et seq.)
### (Against All Defendants)

41.     Schindler incorporates all preceding allegations as though set forth fully herein.

11

0000HSO.0823480  4925-2160-9642v6

42.    Schindler is the rightful legal owner of the Schindler property that was located in the elevator controllers, the Specified Area or other locations within 7 Hanover Square, including certain proprietary manuals, technology (including SIM cards), files and equipment that contain information on Schindler's proprietary maintenance processes and its proprietary PORT technology (the "Misappropriated Trade Secrets").   This data and equipment includes trade secrets under 18 U.S.C. § 1836.

43.    The Misappropriated Trade Secrets are utilized on elevator systems throughout the United States, which is used in interstate (and international) commerce.

44.    Schindler takes reasonable measures to keep this information secret.

45.    Schindler derives independent economic value from the Misappropriated Trade Secrets, including aspects thereof that Schindler does not make available to the public and are not readily ascertainable through proper means by other persons who can derive benefit from the information.

46.    On information and belief, as discussed above, Defendants wrongfully retained the Misappropriated Trade Secrets and disclosed them to one of Schindler's competitors, with the intention of retaining all the benefits of Schindler's proprietary maintenance processes.  Schindler, thus, possesses legitimate concerns that one or more of its competitors will access Schindler's trade secrets as it replaces Schindler as 7 Hanover Square's elevator contractor.

47.    As a direct and proximate result of Defendants' violations of the DTSA, Schindler has suffered substantial harm in the form of lost profits and goodwill.

48.    Accordingly, Schindler is entitled to monetary damages directly and proximately caused by Defendants' unlawful conduct.  Schindler is also entitled to injunctive relief.

## SECOND CAUSE OF ACTION
### Misappropriation of Trade Secrets
### (Against all Defendants)

49.    Schindler incorporates all preceding allegations as though set forth fully herein.

50.    Schindler is the rightful owner of the Misappropriated Trade Secrets.

51.    Defendants exceeded their authority to access, use and disclose the Misappropriated Trade Secrets to third parties, including but not limited to, one of Schindler's competitors with whom Defendants contracted to perform elevator maintenance services at 7 Hanover Square.

52.    Defendants knew or had reason to know that they were not authorized to access, retain or disclose the materials containing the Misappropriated Trade Secrets because such materials were clearly marked as Schindler's property.

53.    Defendants' continued access, retention, use, and disclosure of the Misappropriated Trade Secrets to third parties, including but not limited to a competitor of Schindler, was improper in that it was done in breach of their implicit duty to maintain such data as confidential, to use it solely for Schindler's maintenance purposes, and to return it to Schindler upon termination of Schindler's elevator modernization and maintenance services for Defendants at 7 Hanover Square.

54.    As a direct and proximate result of Defendants' misappropriation of Schindler's trade secrets, Schindler has suffered substantial harm in the form of lost profits and goodwill.

55.    Accordingly, Schindler is entitled to damages to compensate for losses directly and proximately caused by Defendants' trade secrets misappropriation.  Schindler is also entitled to injunctive relief.

13

0000HSO.0823480   4925-2160-9642v6

## THIRD CAUSE OF ACTION
### Conversion/Replevin
### (Against all Defendants)

56.    Schindler incorporates all preceding allegations as though set forth fully herein.

57.    In the elevator controllers, Specified Area or other locations within 7 Hanover Square, or elsewhere in the possession, control or custody of Defendants, there remain various items of Schindler's personal property, including, without limitation, Schindler's Proprietary Materials such as its SIM cards, manuals, and electronic files stored within the Schindler PORT lobby vision programming station.

58.    At all times, Schindler owned and had a right to possess such personal property stored (or that was previously stored) at 7 Hanover Square.

59.    Defendants interfered with Schindler's rights to possession when they deprived Schindler of access to its own personal property and refused to permit Schindler to recover its personal property.

60.    Defendants intentionally took possession of Schindler's property, and purports to permanently prohibit Schindler from recovering its property, without Schindler's authorization, thereby converting Schindler's personal property.

61.    To date, Defendants have not returned Schindler's property despite Schindler's multiple demands for its return.

62.    Defendants' actions constitute unlawful conversion.

63.    As a result of Defendants' tortious actions, Schindler has suffered compensable loss of property.

14

64.     As a consequence of Defendants' conversion, Schindler is entitled to repossession of all property that Defendants converted.

65.     Defendants' conduct was intentional, willful, malicious, and oppressive, thereby entitling Schindler to punitive and exemplary damages.

## FOURTH CAUSE OF ACTION
### Breach of Contract
### (Against 7 Hanover Fee Owner and CR Sunflower)

66.     Schindler incorporates all preceding allegations as though set forth fully herein.

67.     7 Hanover Fee Owner and Schindler entered into the EMM Contract effective as of January 10, 2020, whereby Schindler agreed to perform work modernizing, maintaining and servicing the elevators and elevator systems at 7 Hanover Square.  CR Sunflower and Schindler entered into the 2022 Elevator Contract, whereby Schindler agreed to continue to perform work maintaining and servicing the elevator and elevator systems at 7 Hanover Square.  CR Sunflower is the successor-in-interest to, and/or jointly and severally responsible for the obligations and liabilities of, 7 Hanover Fee Owner with respect to both contracts.

68.     Schindler's Proprietary Materials and personal property, including, without limitation, its SIM cards, proprietary manuals, and electronic files stored within the Schindler PORT lobby vision programming station, were not deliverables under either contract.

69.     Schindler performed all conditions, covenants, and promises it was required to perform under both contracts.

70.     After terminating the 2022 Elevator Contract, Defendants failed and refused to return to Schindler its Proprietary Materials and other personal property, including, without

15

limitation, its SIM cards, proprietary manuals, and electronic files stored within the Schindler

PORT lobby vision programming station.

71.    Neither the EMM Contract nor the 2022 Elevator Contract permitted 7 Hanover

Owner or their managers, agents or representatives, to retain such property after termination of

Schindler's elevator maintenance services under the contracts.

72.    As a direct result of the breaches by 7 Hanover Owner, Schindler has suffered

damages in an amount to be determined according to proof at trial.

**FIFTH CAUSE OF ACTION**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(Against 7 Hanover Fee Owner and CR Sunflower)**

73.    Schindler incorporates all preceding allegations as though set forth fully herein.

74.    7 Hanover Fee Owner and Schindler entered into the EMM Contract effective as of

January 10, 2020, whereby Schindler agreed to perform work modernizing, maintaining and

servicing the elevators and elevator systems at 7 Hanover Square.  CR Sunflower and Schindler

entered into the 2022 Elevator Contract, whereby Schindler agreed to continue to perform work

maintaining and servicing the elevator and elevator systems at 7 Hanover Square.  CR Sunflower is

the successor-in-interest to, and/or jointly and severally responsible for the obligations and

liabilities of, 7 Hanover Fee Owner with respect to both contracts.

75.    Schindler's Proprietary Materials and other personal property, including, without

limitation, its SIM cards, proprietary manuals, and electronic files stored within the Schindler

PORT lobby vision programming station, were not deliverables under either contract.

76.    Under each contract, the parties each have an implied reciprocal duty to refrain

from engaging in any conduct that would frustrate the other party's performance of the contract.

16

0000HSO.0823480  4925-2160-9642v6

77.     Schindler performed all conditions, covenants, and promises it was required to perform under both contracts.

78.     After terminating the 2022 Elevator Contract, Defendants failed and refused to return to Schindler its Proprietary Materials and other personal property, including, without limitation, its SIM cards, proprietary manuals, and electronic files stored within the Schindler PORT lobby vision programming station.

79.     Neither the EMM Contract nor the 2022 Elevator Contract permitted 7 Hanover Owner or their managers, agents or representatives, to retain such property after termination of Schindler's elevator maintenance services under the contracts.

80.     7 Hanover Fee Owner and CR Sunflower breached their implied covenant of good faith and fair dealing by wrongfully failing and refusing to return, or allowing Schindler to retrieve, its Proprietary Materials and other personal property, including, without limitation, its SIM cards, proprietary manuals, and electronic files stored within the Schindler PORT lobby vision programming station, after termination of Schindler's elevator maintenance services under the contracts.

81.     As a direct and proximate result of the 7 Hanover Owner's breach, Schindler has suffered substantial harm.

82.     Accordingly, Schindler is entitled to damages for losses caused by the 7 Hanover Owner's breach of the implied covenant and good faith and fair dealing.

**SIXTH CAUSE OF ACTION**
**Declaratory Judgment**
**(Against all Defendants)**

83.     Schindler incorporates all preceding allegations as though set forth fully herein.

17

0000HSO.0823480   4925-2160-9642v6

84.     Schindler seeks a declaratory judgment pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201(a).

85.     There exists an actual and present controversy relating to the rights and duties of Schindler and Defendants.

86.     Defendants contend that they are entitled to retain Schindler's Proprietary Materials and other personal property, even after termination of Schindler's elevator maintenance contracts for 7 Hanover Square.  Schindler maintains that Defendants are not permitted to retain such Schindler property after the contracts were terminated, and such property must be returned to Schindler.

87.     Schindler contends that Defendants' refusal to return Schindler's Proprietary Materials and other personal property, or allow for Schindler to retrieve it, was and is wrongful, and Schindler is entitled to recover such property.

88.     Thus, an actual and ongoing controversy has arisen between the parties.  In order to clarify the parties' rights, Schindler seeks a declaration that Schindler is entitled to the return of its Proprietary Materials and other personal property, including, without limitation, its SIM cards, proprietary manuals, and electronic files stored within the Schindler PORT lobby vision programming station, that are or were maintained at 7 Hanover Square.

89.     Declaratory relief is currently necessary because, absent a determination of the parties' respective obligations, Defendants will escape their contractual obligations and infringe the property rights of Schindler to the prejudice of Schindler.

0000HSO.0823480   4925-2160-9642v6

## SEVENTH CAUSE OF ACTION
### Unfair Competition
### (Against all Defendants)

90.    Schindler incorporates all preceding allegations as though set forth fully herein.

91.    Through the course of conduct alleged above, Defendants have intentionally and willfully engaged in unfair methods of competition.

92.    Defendants have engaged in unlawful and unfair business practices.  Such acts and practices include, but are not limited to, trade secrets misappropriation, breach of implied covenant of good faith and fair dealing, and conversion of Schindler's property.

93.    Upon information and belief, Schindler alleges that unless restrained by this Court, Defendants will continue to misappropriate Schindler's trade secrets and convert its Proprietary Materials and other personal property, including, without limitation, its SIM cards, proprietary manuals, and electronic files stored within the Schindler PORT lobby vision programming station. Pecuniary compensation will not afford Schindler the adequate relief for the damage caused by such action.

94.    Schindler has standing to bring this claim because, as a result of Defendants' unlawful and unfair attempts to gain a competitive edge in competition and avoid fulfilling their obligations, Schindler has suffered a diminution in value of its assets and decline in its goodwill.

95.    As a result of Defendants' acts alleged herein, Schindler has suffered and will continue to suffer harm in the form of lost money or property, and Defendants have been and will continue to be unjustly enriched.

19

0000HSO.0823480   4925-2160-9642v6

**EIGHTH CAUSE OF ACTION**
**Unjust Enrichment**
**(Against all Defendants)**

96.     Schindler incorporates all preceding allegations as though set forth fully herein.

97.     Through the course of conduct alleged above, including Defendants' continued access, use, and possession of Schindler's property, including its Proprietary Materials, Defendants have received a benefit beyond that which they are entitled to receive under any contract with Schindler.

98.     Defendants have received this benefit at Schindler's expense.

99.     Defendants have retained this benefit under circumstances in which it would be inequitable and unjust for Defendants to retain the benefit and without paying for its value for the period during which Defendants have no longer had the right to such benefit.

100.    Defendants' retention of the benefit has resulted in Defendants being unjustly enriched at the expense of Schindler.

101.    As a result of Defendants' acts alleged herein, Schindler has suffered and will continue to suffer harm in the form of lost money or property, and Defendants have been and will continue to be unjustly enriched.

102.    Pecuniary compensation will not afford Schindler the adequate relief for the damage caused by such action.

103.    Equity and good conscience require that Defendants return the benefit, i.e., Schindler's property including its Proprietary Materials, and provide restitution to Schindler in an amount to be determined at trial.

20

0000HSO.0823480  4925-2160-9642v6

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Schindler prays for judgment against Defendants, and each of them, as follows:

1.     General and special damages arising out of 7 Hanover Owner's breach of the contracts, as well as out of Defendants' misappropriation of trade secrets, conversion of Proprietary Materials and other personal property, and other unlawful conduct alleged herein;

2.     Prejudgment interest on that amount at the legal rate;

3.     Punitive damages;

4.     Injunctive relief to mandate that Defendants return to Schindler its Proprietary Materials and other personal property, and to enjoin Defendants from further engaging in the unlawful acts alleged herein;

5.     Attorneys' fees;

6.     Costs of suit herein;

7.     Declaratory judgement; and

8.     Any such other, further or different relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff Schindler demands a trial by jury on all issues so triable.


Dated: New York, New York
        June 11, 2026

**FBT GIBBONS LLP**


By: *Daniel S. Weinberger*
        Daniel S. Weinberger

One Pennsylvania Plaza, 45th Floor
Suite 4515
New York, New York 10119

21

0000HSO.0823480   4925-2160-9642v6

(212) 613-2000
(212) 290-2018 (fax)

*Attorneys for Plaintiff*
*Schindler Elevator Corporation*

22

0000HSO.0823480   4925-2160-9642v6